## *The probate of the paper propounded as the Will of* PATRICK M. LANGTON.

AN instrument offered as a will, although executed with legal formalities, denied probate on the ground of undue influence exercised upon enfeebled mental capacity.

The weight of evidence was against the soundness of mind of the decedent.

The decedent was shown to have, when in a sound state of mind, evinced a dislike for a church which is found to be the chief legatee and devisee under the paper propounded.

The decedent was shown to have, when in a sound state of mind, expressed an affection for his wife, for whom the paper offered as a will provides inadequately.

The only persons cognizant of the drawing of the will were the clergymen and their counsel; and it was prepared without openess or publicity.

Held, that the will was the will of the clergymen and their counsel, and not of the decedent.

ALEXANDER W. BRADFORD, *for Proponents.*
RICHARD N. HARRINGTON, *for Contestants.*

PATRICK McELROY propounded for probate, on the 10th day of November, 1865, a paper purporting to be the will of Patrick M. Langton, deceased, setting forth that it related to both real and personal property; that the widow of the decedent was Lydia M. Langton, and that the only next of kin and heirs-at-law were Mary Langton, the mother of the decedent, and Robert Langton, his brother. Citations were accordingly issued to these parties, who appeared and opposed the probate on the following grounds:

That at the time of the alleged making of the said paper writing, purporting to be the last will and testament of the said Patrick M. Langton, he, the said Patrick, was not of sound mind or memory, and that he was destitute of testamentary capacity.

That the said alleged will was obtained by fraud or undue influence, practiced on the said Patrick M. Langton, prior to and at the time of the making thereof.

That the said alleged will was obtained from the said Patrick M. Langton by fraud, and undue influence exerted over the mind of the said Patrick, when his mind was enfeebled by sickness, and he by reason of such sickness was near death.

That the said alleged will is void in law, the gifts and devises therein being illegal, and contrary to the letter and policy of the law.

That at the time of the making of the said alleged will, the said Patrick M. Langton was unacquainted with the contents thereof.

That the said Patrick M. Langton did not, at the time of the making of the said alleged will, declare the same to be his last will and testament.

That the subscribing witnesses of the said alleged will, did not sign the same in the presence of each other.

That the said Patrick M. Langton did not sign the said alleged will in the presence of the said subscribing or attesting witnesses.

The following is the paper propounded as the will:

In the name of the Most Holy Trinity, Amen. I, Patrick M. Langton, of the city of New York, being of sound mind and memory, though weak in body, do hereby make, publish, and declare this my last will and testament.

First. I direct my executors to pay all my just debts, and my funeral and testamentary expenses, immediately after my decease.

Second. I give and bequeath to my wife, Lydia M. Langton, all my furniture, linen, plate, plated ware, and other household goods. Also, a certain debt, secured by judgment, in the State of Pennsylvania, owing to me by Jacob Fry, and amounting to about the sum of three

hundred and twenty-four dollars. Also, a certain other debt due to me by Charles Marylin, of Pottsville, on his bond, dated 30th December, 1863, together with the mortgage by which the same is secured. I also give and bequeath to my said wife an annuity of four hundred dollars per annum during her widowhood, payable semi-annually, beginning from the day of my death. I charge the payment thereof upon the leasehold premises mentioned and bequeathed in the third clause of this my will, during the remainder of the term of said lease, provided always, that my said wife should so long remain unmarried; and after the expiration of said lease, I charge the payment of said annuity upon the personal property and proceeds of the real property bequeathed and devised in and by the fifth clause of my will, so long as she shall remain unmarried.

Third. I give and bequeath to the Most Rev. John McClosky, Archbishop of New York, that certain lease, bearing date the seventeenth day of March, in the year one thousand eight hundred and fifty-eight, made by Oliver H. Jones to me, Patrick M. Langton, and recorded in the office of Register of the city and county of New York, in Liber 755 of Conveyances, page 114, on the thirty-first day of March, 1858, together with the leasehold premises therein described, and all manner of benefit and advantage to accrue therefrom : to have and to hold the same to him, his executors, administrators, and assigns.

Fourth. I give and devise to my mother, Mary Langton, the use of the house in which she now resides, at Pottsville, in the State of Pennsylvania, during her natural life. I also give and bequeath to her an annuity of six hundred dollars during her natural life, payable quarterly, and commencing from the day of my decease; and I hereby charge the payment of said annuity upon the personal property mentioned in the next succeeding clause of this my will, and numbered "Fifth," exclusively of all other property.

Fifth. I give and devise to the Right Reverend James F. Wood, Bishop of Philadelphia, all the real estate whereof I may die seized or possessed, or to which I may in anywise be entitled, situated in the State of Pennsylvania: to have and to hold the same to him, his heirs and assigns, forever. I also give and bequeath to the said Right Reverend James F. Wood all the rest and residue of my personal estate, of whatsoever kind, not herein above bequeathed, subject, however, to the charge of my wife's annuity, as expressed in the second clause of this my will.

Sixth. I appoint the Most Rev. John McClosky, Reverend Dr. Jeremiah W. Cummings, and Patrick McElroy, all of the city of New York, my executors for the purpose of administering my estate in the State of New York; and I appoint the Right Reverend James F. Wood, of Philadelphia, and the Reverend Nicholas J. Walsh, of Pottsville, my executors, for the like purpose, in the State of Pennsylvania. I revoke all other wills by me at any time heretofore made.

Seventh. In case of the death of the respective legatees named in the third and fifth clauses of this my will, or either of them, before me, the bequests and devise in said several clauses contained shall not lapse, but the same shall respectively vest in the person or persons who may at the time of my death be the Roman Catholic Archbishop of New York, or the Roman Catholic Bishop of Philadelphia, or, in case of the vacancy of said Sees or either of them, in the Ordinary of such vacant See, by whatever title he may be known.

Eighth. I desire that my remains be interred in the Catholic burying ground in Pottsville, aforesaid, and that my executors expend the sum of five hundred dollars for a monument to be erected over my grave.

In witness whereof, I have hereunto set my hand and seal, this twenth-sixth day of October, in the year of our Lord, one thousand eight hundred and sixty-five.

First page, "Charles Marylin," written over an erasure; fourth page, at end of sixth clause, "subject, however, to the charge of my wife's annuity, as expressed in the second clause of this my will," interlined before execution.

PATRICK M. LANGTON. [L. S.]

Signed, sealed, published and declared, by Patrick M. Langton, the testator, in our presence, as his last will and testament. Whereupon, we, at his request, in his presence, and in presence of each other, have hereunto subscribed our names as witnesses, this attestation clause having been first read aloud.

E. BAILEY, 518 Sixth Avenue.<br>
THOS. A. HUNTER, 1247 Broadway.<br>
T. JAS. GLOVER, 123 East 30th St.

THE SURROGATE. The present proceeding is one of the most interesting and important that has come before me for trial during my term of office. The amount of the property involved, the respectability of the parties, the interest taken in the litigation by influential members of a church on the one hand, and by the adherents of a numerous society, on the other, the length and earnestness of the trial which has been gone through, all combine to make it one of the *causes celèbres* of the Surrogate's Court.

I dismiss, without consideration, the point raised by the contestants, that the will is void on its face, under the act of 1860, which declares invalid all devises and bequests to religious corporations, amounting to more than one-half the testator's estate. The legal invalidity of a devise or bequest contained in a will cannot be set up as a ground of contest upon a probate proceeding. The question is purely of the *factum* of the will.

I shall proceed to recite at length, and consider the testimony of the witnesses cognizant of the *factum* of the paper here propounded.

Elbert Bailey was the first witness called for proponents. He testified that he was aged forty-six; grocer by occupation; knew decedent for seven or eight years; decedent lived corner of Broadway and 31st street, one hundred and fifty or two hundred feet from this witness; knew decedent's wife; the decedent had no children; decedent was a coal dealer; saw him every day; he dropped in at witness' place, and dealt with witness, and so did decedent's wife; saw decedent in his last sickness, but did not go into his house to see him, except on the occasion when the witness signed the paper here offered as a will; decedent was confined to the house about two or three weeks; witness heard he had consumption; he talked about his cough; he had a bad cough; he had had it several years; don't know who was his doctor; when witness went in to see him, found him in his room, front room, second floor; there was no bed there, but one in a back room adjoining; found Mr. Thomas James Glover there, and also Mr. Thomas A. Hunter; had no acquaintance with Hunter before that time; witness thinks Mrs. Langton, decedent's wife, came to his place and told him the decedent wanted to see him; went round accordingly in the evening; did not know what was wanted; when witness went in, he saw Hunter sitting in the hall-way.

Q. You went into the room and saw Mr. Langton? A. Yes, sir.

Q. Did you see Mr. Langton sign that paper? A. Well, I could not say about that, it is so long ago; I paid no attention to it; I don't remember; I did not suppose I would ever hear of it again.

Q. Try to refresh your recollection, and say whether you saw Mr. Langton sign that paper? A. I could not say that I did; I don't remember.

Q. Did you sign that paper? A. I see my name here; I did.

Q. Do you recollect that you did? A. Very distinctly.

Q. Then when you signed your name there, you saw the paper? A. I must have seen it.

Witness thinks the decedent was sitting in a large chair; witness signed this paper on a table standing in the room; thinks this paper was lying on the table when he signed it; don't recollect anything about it, particularly, but supposes there must have been a table there; witness' memory is not very good, it is very poor, indeed; thinks he saw Hunter sign this paper, at the table; could not say that Glover signed it; remembers very little about it; did not look at the paper after signing it; left the room very soon after they got through with him; there might have been something said as to what the paper was; don't remember; thinks he heard something said about its being his will; don't remember more than that.

Q. Who said it was a will, or his will? A. I cannot say whether it was Mr. Glover or Mr. Langton.

Q. Did you see Mr. Langton write at that table at all? A. I could not say that I did; I don't recollect that I did.

Q. Do you recollect any conversation that occurred in the room while you were there? A. I recollect very little indeed; I don't know that I could tell a word that was said there; I don't think I could.

Q. Can you tell the substance of any thing you heard? A. I don't know that I could; I understood by some means, whether from Mr. Langton or Mr. Glover, I don't know, that this was a will; but I heard it in some way.

Q. While you were in the room? A. Yes, sir.

Q. Did any body ask you to sign the will? A. I suppose they did.

Q. You don't recollect? A. Not distinctly about that; as a matter of course, I suppose some body asked me to sign it; it is something I didn't suppose ever would come up before me again, and I didn't think of it.

Q. Did you ask Langton how he was? A. I think we said something about the state of his feelings.

Q. Are you sure? A. I am not sure about that.

Q. Was Mrs. Langton present ?   A. She was not.

Q. Are you sure of any thing now, except that that is your name ?   A. I am not.

Thomas A. Hunter, of 1247 Broadway, keeps a fancy store; knew the decedent, over six years; saw him often; lived in one of the decedent's houses, in the same block with him; was his tenant for six years and paid rent to him monthly; visited him also socially, at both his office and his house : knew his wife; decedent had been ailing a number of years; it was said he had consumption; don't know how long the decedent was confined to his house before his death; witness was in decedent's house several times during his sickness; found him in bed sometimes and sometimes sitting up.

Q. Did you sign that paper (the one propounded) ?   A. Yes, sir; it has got my signature here : it looks like my signature.

Q. How about the address, does that look like yours ?   A. Yes, sir; the address is right.

Q. Did not you write the address ?   A. Yes, it looks like my writing.

Q. Did not you write the address ?   A. This looks like my name that I have written.

Q. Did not you write it ?   A. I remember writing my name on some document, and this looks like it.

Q. Do you mean to say that you cannot swear that that is your handwriting ?   A. Yes, sir; this is my handwriting.

Q. Why have you been hesitating about it for five minutes then ?

[Objected to; objection overruled.]

A. Well, I don't know.

Q. When did you write it there ?   A. The last of October, or the first of November last.

Q. Where did you write it ?   A. I wrote this, I believe, in Mr. Langton's, as far as I remember.

Q. I say where did you write it ?   A. I wrote it in Mr. Langton's.

Q. On what did you write it; on a bed, table, chair, or book? A. I wrote it on a table.

Q. What room of Mr. Langton's was it written in? A. It was in his front room.

Q. How did you come to go up there; did any body send for you? A. There was word left in the store, that he wanted me to call at a certain hour in the evening.

When witness went there, at the hour appointed, he found Mr. Langton and Mr. Glover; Bailey came in afterwards; don't know whether Bailey and witness spoke to Mr. Langton; they made motions when they went into the room; witness thinks the decedent was standing up when they went in; don't remember whether the decedent sat down.

Q. Did he look strong or feeble? A. Well, he looked very agitated.

Q. How did he show that? A. Well, he showed it by his looks.

Q. What about his looks? A. He looked very strange from what I used to see him.

Q. How was he strange? A. Quite agitated.

Q. How was he agitated? A. His appearance was quite wild looking.

Q. Did he look wild out of his eyes? A. Yes, sir; his eyes and general aspect was rather queer and wild looking.

Witness has seen consumptive people, in the last stages of disease; they have a queer look in their eyes generally; witness and Langton did not speak together at all; but witness said "good evening," when coming away; don't remember whether anybody sat down, while witness was there, except that the witness himself sat down to write his name, and Bailey sat down to sign his name.

Q. How about Mr. Langton—did he sign it? A. I don't remember.

Q. Did he sit down or stand up? A. I don't remember.

Q. Did you see Mr. Langton sign that? A. I don't remember.

Q. Will you say you did not see him sign it? A. I don't remember.

Q. You have got to answer that question. Will you say that you remember that he did not sign it in your presence? A. I don't remember any further.

Q. You have got to answer that question? A. I answer all that I can remember.

Q. (By the Court.) Will you say that you remember he did not sign it? A. I don't remember Mr. Langton's signing it.

Q. Do you remember that he did not? A. I don't remember seeing him sign it.

Q. Do you remember that he did not sign it? A. I don't remember seeing him sign it.

Q. Can you say that you remember that Mr. Langton did not sign that paper in your presence on that occasion?

[Contestants' counsel objects to the question being again put to the witness. Objection overruled.]

Q. (By the Surrogate.) You are asked whether you can swear that you remember that he did not sign it; that question you can answer "Yes," or "No."

[Objected to. Objection overruled.]

A. I don't remember seeing him sign it on that occasion.

The Surrogate—The witness declines to answer that question; it is very evident that he does not intend to answer it.

Proponent's counsel declines to examine the witness any further at this state of the case.

Thomas James Glover, called for proponents: Forty-three years old; resides 123 E. 30th street, and is a lawyer by profession; knew the decedent about seven or eight days before the execution of the paper propounded in this proceeding; drafted the paper from which this was engrossed, and signed this paper as a subscribing witness; was present with the decedent, Bailey and Hunter, at that

time; was with decedent in his front parlor, and Bailey and Hunter were outside in the hall; when the will was ready for execution, Mr. Langton rose from his chair, went to the door of the parlor, opened it, and asked those gentlemen in; one of them, I should have observed—I think the last witness examined, Mr. Hunter—had been in the room a few moments before, and at the request of Mr. Langton had stepped out into the hall; when they came in, Mr. Langton introduced me to the other witness; I don't know whether any ordinary conversation ensued; but to come immediately to the matter of the will, I then said that Mr. Langton was going to execute his will; Mr. Langton sat down on a chair; the will was on a table before him; Mr. Langton signed his name to the paper, this signature, in presence of all three of us.

Q. About how nearly contiguous were you to the place of signing? A. We stood as if you were now Mr. Langton, and this the table (the stenographers' table), and we stood all three behind it in a semi-circle, close to him, and facing the table; I then told Mr. Langton to repeat after me the following words, which I spoke slowly, and he repeated them; they were the usual words, as near as I can state them, in this form: "I do declare this to be my signature [or my hand], and I do declare this paper as subscribed by me to be my last will and testament, and I do request these three gentlemen here present to become the subscribing witnesses thereto;" I then said, "I will now read the attestation clause;" I read the attestation clause aloud, as it is here; I then asked first one and then the other of these gentlemen to sign; each of them did so; then I signed; and this was all in presence of Mr. Langton; the three witnesses were standing; Mr. Langton, I think, still seated; I said, "gentlemen, I understand you are the neighbors of Mr. Langton, and know that he is competent to make a will?" They both said, "Oh, yes; we know that;" one of them made some observation about hoping his health would improve,

or something like that, and the two other witnesses almost immediately left.

Witness left the will with decedent in an envelope, closed, indorsed "The last will and testament of Mr. Langton;" there were two other papers signed by decedent after these two witnesses went away; witness recollects something about saying to the two witnesses to sub-join their residences to their signatures, and called their attention to the fact that there was noted an addition to or alteration in a clause of the will, above the attestation clause; the witness has no doubt that the mind of the decedent was entirely sound and clear.

On cross-examination; the witness said he first went to the house of the decedent on the 18th day of October, 1865; wrote a letter for the decedent, the next day, to Francis W. Hughes, Esq., of Pottsville, Pennsylvania; exclusive of the occasion of the execution of this paper, the witness thinks he was five or six times at the decedent's house; the first time he went there with the Rev. Dr. McGlynn, who called for witness to accompany him; in calling at the house on that occasion they were let in by some person at the door; does not recollect whether it was Mrs. Langton or not; saw nobody in the decedent's room, but the decedent, on that occasion; went to that house, the second time, about two days after the first interview; went alone; saw nobody but the decedent, except the person who let witness into the house; went the third time, within two or three days after; recollects the fourth time; was there more than four times; can't recollect how soon the fifth visit was after the fourth; recollects the purposes of five different interviews; thinks he was there six times; was there twice the day this paper was executed; once in the morning and once in the evening; saw the decedent every time witness was there; I did not see any one in the room with Mr. Langton and myself, except, I believe, the first time, a female; I don't recollect whether it was the servant or Mrs. Langton;

made some mention about the table he had been eating something on; I don't recollect any other person in the room on any other occasion until the execution of the will.

. Q. From the time then, when you first went with this clergyman, until the time of the execution of the paper, you saw no person, except one time, you think, some person removed something from the table upon which he had been eating? A. That is so; I speak of the room as the front room and parlor, and not as including the room in the rear of it, which, I believe, was his bed room.

. Q. It was one and the same thing, with a very wide folding door? A. The folding door was closed, I think, on all occasions except one; it was, if I recollect right, a folding door with glass in the upper part.

. Q. What part of the upper part you say had glass? A. Well, from about three feet, we will say, above the ground; it is a very casual impression.

Q. At these interviews were the doors always closed? A. The doors were always closed, if I recollect right, except on the morning of the day, when I called, on which the will was executed.

Q. Were they open then? A. If I recollect right they were open then.

Q. Were they closed on the morning of that day? A. I think not.

Q. They were open then during the whole of the time you were there? A. Yes, sir; I think so.

. Q. Were they opened or closed in the evening when will was executed? A. They were closed, so far as my recollection goes.

. The witness never saw Mrs. Langton, decedent's wife, in the room with him; thinks he saw her in the hall, or at the door; cannot say how many times he saw her, nor whether more than once; witness never knew Rev. Dr. McGlynn before he called on witness to take him to the house of the decedent; the witness knew Rev. Dr. Cum-

mings and Most Rev. Archbishop McClosky, and Mr. Patrick McElroy and his wife; knew McElroy eighteen or nineteen years; during part of that time McElroy has been a client of. the witness; relations with him commenced in 1856; witness has known Rev. Dr. Cummings since about 1848; has had in his hands business and interests in which Dr. Cummings was interested; cannot say that there has been any time since witness' first acquaintance with Dr. Cummings, when the relation of attorney and client has not existed between them; but Dr. Cummings has had other counsel also; had very friendly relations with Dr. Cummings; Dr. Cummings never visited the witness' house but once; was never but twice in Dr. Cummings' house from 1864 till his death; seldom met him, except at church; was a member of his church since 1854; witness has known Most Rev. John McClosky, Archbishop, since 1840; the Archbishop has consulted the witness upon four or five matters of business; the Archbishop has had other counsel, namely, Mr. O'Conor, who was suggested to the Archbishop by this witness; no others, in matters connected with the arch diocese.

Q. You have been the counsel for the Archbishop in reference to all business matters connected with the church in the city of New York? A. The question is too broad for me to answer in that way; I cannot say that.

Q. I suppose that was no broader than your previous answer. To the extent of your knowledge, have you known of any other counsel being employed, except Mr. O'Conor, on your suggestion, in reference to matters in the city? A. In regard to that, unless you confine yourself to the Archbishop, I must say I don't know anything about it, because each clergyman generally employs whom he pleases for matters relating to his own church.

Q. Have you, since the death of Bishop Hughes, known Bishop McClosky to employ any other counsel, except yourself, in reference to church matters, for any other

Roman Catholic minister? A. Yes, sir, I know it, by other lawyers speaking to me on the subject. .

Q. Who was that? A. One was a gentleman by the name of Churchill, not for this city; I think that diocese was outside of the city; I think this clergyman was.

Q. I mean in this diocese? A. I can recall another; one is Mr. Morrogh, for his brother, the Rev. Mr. Morrogh; he spoke to me about the affairs of the church.

The witness did not understand that this matter of this will had been laid before the Archbishop, at the time the witness went to decedent's house.

At the first interview, the decedent told witness about his property, with considerable detail, and how he wanted to dispose of it; witness asked him for a piece of paper; decedent got it, and witness took down a minute of his wishes, in pencil; did not make suggestions; there was a great deal of conversation; witness merely took down heads for the purpose of enabling him to draw the will; made no suggestions except as to the form in which the property was to be disposed of; suggested the names of the persons to be executors, after decedent had said his purpose was to leave his property to the church, and that he wanted the church people to take charge of it; don't suppose decedent was acquainted with Archbishop McCloskey; did not know whether he knew Rev. Dr. Cummings; at first decedent said he did not know Patrick McElroy, but then he said he did know him; the witness suggested to decedent that the provision he had made for his wife was not sufficient for her support; the provision was left incomplete in the memorandum, at the first interview.

At the second, or perhaps the third, interview, witness made another memorandum of instructions; witness had made an incomplete draft of a will before taking this second memorandum; these were the only memoranda witness made, except a list of tenants; after making the draft, witness made some alterations in it; some of the

changes and additions, or filling in of blanks, were made in pencil on reading the first incomplete draft to the decedent; afterwards witness added, at his office, some others he had noted in pencil ; these constitute the draft of the instrument as it now is, except one clause, the addition of which is noted, and was made on the evening of the execution of the paper; the witness read the draft-will on the pieces of paper which, together, make the draft, to the decedent, at the second interview ; at that time the words Lydia M. Langton were not written in the body of the draft; witness then wrote in the name, and then made other pencil alterations from instructions given at the time; the decedent then instructed witness that he wished to give his wife $400 a year during her widowhood, and witness made memorandum in pencil as to that; witness thinks he suggested to decedent to provide that this $400 annuity be charged, after the expiration of the lease, on the property given to the Bishop of Philadelphia; the original imperfect draft was read by witness to decedent on the second interview.

Witness thinks it was on the third interview that he presented to decedent an engrossed copy of the will, but which had a blank left in it, in relation to the Marylin judgment, and read it to decedent, who instructed the witness to change it in certain respects; witness took down these instructions in writing, and then directed the will to be changed in those respects.

At another interview, either on the morning of the day the paper was signed, or at a previous visit, witness read to decedent, from this engrossed copy of the will, the new clauses he had had inserted in it. Witness left the paper with the decedent on the morning of the day of its execution; there was then no conversation about it, except as to its execution ; on that evening, when witness arrived, the decedent asked the witness if it was clear to his mind that the provision for his wife was charged upon the property that went to the Bishop of Philadelphia; he said:

" is that clear to your mind, Mr. Glover ?" Witness then took the paper and a pen, and wrote these words : "subject, however, to the charge of my wife's annuity, as expressed in the second clause of this my will;" witness wrote this while the witnesses were outside in the hall; decedent did not object, at any time, to the will as not giving enough to his wife; nor say that the will was not right because witness had not given the dwelling house in it to the decedent's wife; witness did not understand from decedent that Dr. McGlynn had had conversation with him in respect to the disposition of his property; Dr. McGlynn was present when the memoranda in pencil were made by witness; don't recollect conversing with Dr. McGlynn about the disposition to be made of the house; witness won't be positive he saw Mrs. Langton till after decedent's death, when he asked her for the will; had never spoken to her, unless she was the person who let him into the house, when witness asked if Mr. Langton was in; went to her for the will the day after witness heard of decedent's death—the day of the funeral; the witness produces an order drawn by him October 18, 1865, directing C. E. Miller, Esq., to deliver to witness a lease of property, and signed by the decedent.

The witness also produced and proved the signing by the decedent of the two letters following:

NEW YORK, *October 26th*, 1865.
*To the* Right Rev'd JAMES F. WOOD,
*Bishop of Philadelphia :*

I have this day duly executed my last will and testament, and I have therein bequeathed to you all my real estate situate in the State of Pennsylvania, and all the residue of my personal estate, not otherwise disposed of. By the terms and legal effect of my will I have vested the title to said property, real and personal, in you, absolutely, and such, in fact, is my intention. But my purpose in so doing is that said property be faithfully devo-

ted by you for the use and benefit of the parish of St. Patrick's Church, in Pottsville, Pennsylvania. I leave it to your own judgment to direct the particular manner and uses in and to which the said property and the income and proceeds of the same, shall be applied, for the benefit of said church. I have full confidence that, worthily filling the high and holy office to which you have been elevated, you will execute the sacred trust which I impose as a conscientious duty. I earnestly request of you and of the pastors and congregation of St. Patrick's Church, aforesaid, occasional remembrance of me in their prayers at the Holy Sacrifice of the Mass.

PATRICK M. LANGTON.

Witness: T. J. GLOVER.

NEW YORK, <i>October 26th,</i> 1865.

*To the* Most Rev'd JOHN McCLOSKY,

<i>Archbishop of New York.</i>

I have this day duly executed my last will and testament, and I have therein bequeathed to you my leasehold premises situate in the southwest corner of Broadway and Thirty-first street. By the terms and legal effect of my will, I have vested the title to said leasehold premises in you absolutely, and such, in fact, is my intention. But my purpose in so doing is that the said premises be faithfully devoted by you for the use and benefit of the parish of St. Stephen's Church, in Twenty-eighth street, between Lexington and Third avenues, in the city of New York. I leave it to your own judgment to direct the particular manner and uses in and to which the said property, and the income and proceeds of the same, shall be applied, for the benefit of St. Stephen's Church, aforesaid. I have full confidence that, worthily filling the high and holy office to which you have been elevated, you will execute the sacred trust which I impose as a conscientious duty. I earnestly request of you and of the pastors and congre-

gation of St. Stephen's, occasional remembrance of me in their prayers at the Holy Sacrifice of the Mass.

PATRICK M. LANGTON.

Witness: T. J. GLOVER.

Edward McGlynn, pastor of the Roman Catholic church of St. Stephen's, New York, testified that a lady, purporting to be Mrs. Langton, wife of decedent, called at the pastoral residence of that church, with the object of getting Rev. Dr. Cummings to visit her husband, to administer to his spiritual wants. Dr. Cummings being ill, the witness heard her statement, and at her urgent request, visited the decedent; cannot say that Mrs. Langton stated that the decedent had requested to see Dr. Cummings or some other gentleman; on calling upon the decedent, the latter entered into conversation with witness, concerning witness' family; spoke of acquaintance with the witness' brother; repeated some facetious remarks of witness' brother; said witness' brother had remarked that he, the decedent, was a paying member of the church, and desired the witness to request his brother to call in and see the decedent; he said: "Mr. McGlynn, I consider this a business visit; I have property worth about $40,000;" decedent enumerated his property; he said he wished to leave to Dr. Cummings and St. Stephen's Church the leasehold property corner of Broadway and 31st street; he mentioned the annual receipts from that property; he said the lease had seven years to run; he asked witness to request Dr. Cummings to send him a lawyer of his, Dr. Cumming's, confidence; none of those young chaps, but a lawyer who would secure the property for the church, without danger of further difficulty; he told the witness that he would leave the household furniture to his wife; he told witness that he, decedent, had been, or was, a member of the fraternity of the Freemasons, and expressed his willingness to resign his connection with the fraternity if the rules of the church should so require; wit-

ness delivered the message to Dr. Cummings, and at Dr. Cummings' request, witness introduced Mr. Glover to the decedent the same evening, and was present at the interview between Glover and the decedent; the decedent repeated substantially his statement previously made to this witness, concerning the value and character of his property, and repeated his intention as to its disposal; Mr Glover took written notes and said that to secure the property for the church, he would make the bequest to Archbishop McClosky, with a letter of instruction, obliging the Archbishop in conscience to use the property for the benefit of St. Stephen's Church; Mr. Glover expostulated with decedent concerning what he considered the small portion the decedent was willing to leave to Mrs. Langton, and induced the decedent to consent to better terms in favor of Mrs. Langton; the interview lasted nearly an hour; the witness visited the decedent once or twice more, within a week; the witness' opinion is that decedent was an unusually cool, calm, self-possessed, rational, business-like man; Rev. Father Driscoll of St. Francis Xavier's Church, attended decedent as his confessor; witness did not administer to the decedent any rites of the church; witness requested Father Driscoll to attend the decedent.

On cross-examination this witness testified:

Q. Were you there with Driscoll at any time? A. To the best of my remembrance, I was not.

Q. Won't you give me the whole of the conversation that took place between you and Langton in respect to his withdrawing his association from the Freemasons? A. To the best of my remembrance, he expressed his feelings or conviction.

Q. I want you to give the language? A. I cannot do it in precise words; I cannot give the conversation verbatim.

Q. Who introduced the subject of Freemasonry at this conversation? A. I think that he did.

Q. What did he say in introducing it? A. To the best of my remembrance, that he was a Freemason; I believe he also showed me a diploma, or instrument, of the fraternity hanging on the wall of his room.

Q. What did you say to that? A. To the best of my remembrance, I assented.

Q. I want you to give the language? A. I cannot do it in precise words; once for all, I state, that I do not pretend to give verbatim the conversations that took place concerning Freemasons.

Q. Have you stated now all that you recollect of the conversation that took place between you and him, in respect to his being a Freemason, and his withdrawing from the order? A. I have not stated; I was proceeding to do so, but I cannot give it verbatim; to the best of my remembrance he expressed his feeling or conviction, that his connection with the fraternity of Freemasons was not in perfect accordance with his duty as a member of the Catholic church.

Q. Did he express that conviction, or did you urge it upon him? A. To the best of my remembrance, he expressed such conviction before I had said anything upon the matter.

Q. Did he voluntarily do it, or was it urged upon him by you? A. He did it voluntarily.

Q. Have you now stated all the conversation that you recollect of? A. Not yet.

Q. Go on. A. I assented to the extent that it would be advisable, if not imperative, for him to resign such connection; that is the substance; I do not remember anything further.

Q. How did you know he was a member of the Catholic church? A. I gathered it from the conversation of Mrs. Langton, and from his own.

At the first visit witness found the decedent seated in an easy chair, and thinks he was in such a position at each visit, except one, when he was in bed in the back

room; thinks he had four interviews with the decedent; had conversations with Mrs. Langton at each visit; at the first one, said "good day" to her; at the second, exchanged civilities and conversed concerning her husband's health; witness wishes to correct this; he don't remember whether he conversed concerning her husband's health, with Mrs. Langton at the second interview; the one at which Mr. Glover was present; at that interview the witness informed Mrs. Langton that he wished to see her husband, and that he desired the gentleman he had brought with him to see decedent also; can't remember any other conversation with her that night; can't say positively whether witness saw her at the third visit; she was present at the interview had with the decedent when he lay in bed; don't know whether this was on the third or the fourth visit; believes he had a conversation with her at that time, namely, an interchange of civilities, and inquiries and conversation concerning her husband's health; no further conversation with her before her husband's death; had a conversation when she came to the pastoral residence, after decedent's death, to make arrangements for the funeral services; at that interview she desired witness to use influence with the Catholic priest at Pottsville (whither the decedent's remains had been sent for interment) to have religious services over his remains; she expressed a decided preference to have the services of the Catholic Church over his corpse rather than the ceremonies of the Masonic fraternity, and expressed or implied the fear or opinion that, in the event of the refusal of the Catholic priest at Pottsville to perform religious services, the ceremonies of the Masons would be performed; witness cannot give any conversations that took place on any other occasion between himself and Mrs. Langton. .

Q. Do you recollect of her asking you, at any of these interviews, whether you or Mr. Langton was making any preparations towards preparing or making his will?

A. The impression now on my mind, but it is not an absolute certainty, is that she made some allusion to the fact that Mr. Glover was engaged in drawing a will.

Q. Did she use the name Mr. Glover? A. I cannot say what she said.

Q. Were you and she alone? A. I think we must have been.

Q. Where were you? A. At her house.

Q. What part of the house? A. I cannot say positively, but I presume in the hall, or in one of the two rooms already described.

Q. Was it not in the hall, just after you had left his room? A. I cannot say positively that it was.

Q. Can you say that it was not? A. I have not sufficient remembrance to say, either the one way or the other.

Q. What time of the day was that? A. I cannot remember.

Q. What was the conversation between you? A. I cannot remember.

Q. Did she not tell you, in substance, that the man was not competent to make a will? A. I don't remember that she did.

Q. Did she not tell you, in substance, that if he was going to make a will some of his friends should be present? A. I don't remember that she did.

Q. Will you say she did not? A. To the best of my knowledge and belief, she did not.

Q. Did she not tell you, at that time, that the man had not his mind or his reason sufficient to make a will? A. I am morally certain she did not.

Q. As a fact, did she? A. To the best of my knowledge and belief, she did not.

Q. Will you say that she did not, not to the best of your knowledge, tell you, at that time, that the man had not his mind nor his reason sufficient to make a will? A. She did not.

Q. State the whole conversation that took place between you and Mrs. Langton in respect to the will? A. I don't know that I can remember any more than I have already stated; but if it covers all the interviews previous to the interment of Mr. Langton, I can say that, to the best of my knowledge and belief, in the interviews which I believe took place concerning the funeral services and his interment, she did make allusion to the fact that he, in his will, had made a legacy or bequest; had left something for the benefit of St. Stephen's Church; and, to the best of my remembrance, she did not seem to disapprove of such action on his part.

Q. Did she say anything in respect to approval or disapproval? A. I cannot say that she did, but I believe she abstained from saying anything in disapprobation.

Michael Driscoll, called for proponents, testified that he was a clergyman of the Catholic Church; and was called upon to attend a man in 31st street, between Broadway and Sixth avenue, whose name he cannot state; he was thin, and suffering, as it were, from consumption; witness administered the rites of the church to him, as a dying man; administered the sacraments; witness objects to saying whether he heard this man's confession; certain sacraments are administered to persons who are neither capable of speaking or hearing—in the last agony of death; this man was capable of answering questions put to him fairly; his mind was capable of understanding and answering; witness thinks he was sane at the time.

These are the only witnesses whose testimony can throw any light upon the circumstances attending the making of this paper propounded as a will, and I have quoted their testimony in full. The rest of the evidence taken before me, relates exclusively to the mental condition of the decedent between the 18th of October and the 26th, the date of the execution of the instrument.

I consider the proponents to have proven the observ-

ance of the formalities required by the statutes of our State at the execution of testamentary papers. The presence and agency of Mr. Glover, a counselor of long experience and thorough acquaintance with the necessary requisites, makes it morally certain that all was done that should have been done in the way of subscription, acknowledgment, publication and rogation of witnesses, and signature by them. It was very evident on the trial that Messrs. Bailey and Hunter were hostile to the paper propounded, and very reluctant to assist in its probate. The former did not remember anything that took place, and was sure of nothing, except that his name was upon the paper in his own handwriting. Mr. Hunter's memory was equally treacherous; he remembered absolutely nothing. The deficiencies in the evidence of these lay witnesses are, however, fully supplied by the positive recollection and averment of Mr. Glover, who not only knew what ought to have been done, but knew what was done, and tells it to us in detail. All legal formalities, therefore, having been complied with, the question of mental capacity and undue influence remains.

A conflict of evidence occurs upon these points, as is almost always the case in trials of this nature. The question itself is one of the most difficult to decide in all the range of human investigation. I must here repeat my regrets, so often asserted, that our system gives no authority for the submission of such issues of fact to a jury in the first instance, and imposes the responsibility of a decision upon a single officer. The slight and impalpable boundary that divides soundness of mind from unsoundness, is to be ascertained and defined from testimony generally biased, and almost always uncertain in its terms and definitions. In such trials the evidence of the medical attendants is the most reliable, and it is to the sworn opinion of Dr. Powell, the physician who attended Mr. Langton, that I have given the greatest weight in the conclusion I have arrived at.

. Dr. Alfred Powell first knew and attended Mr. Lang-ton in April, 1865. He was his physician from that time till his death, on the first of November. Mr. Langton was able to consult the doctor at the office of the latter until August, after which the doctor visited at the house. The disease was pulmonary consumption. The first of October the disease assumed all the symptoms of acute phthisis; the patient had chills, followed by fever; quick in pulse, and exhausting night sweats, and rapid emacia-tion, extreme restlessness and prostration, accompanied by delirium and a general failing of his mental faculties. From the 1st to the 18th his memory was bad. On the morning of the 18th, early, the doctor was with him two hours. He found him semi-comatose, and almost in a state of collapse, insensible. They gave him stimulants freely, and reaction commenced in about an hour. He seemed to recover in a couple of hours. This was the day of the first visit of Mr. Glover, and the second visit of Dr. McGlynn. Doctor Powell called again between five and six P. M., and found the condition of Langton very feeble, his pulse very low, merely able to answer yes or no. Much prostrated and exhausted. He recognized the doc-tor on his putting his hand on him and calling him by name. The 19th, his mind was very dull. The 20th, he was better; but from the 18th to the 26th there was no improvement in mental faculties; he was not competent to transact business understandingly; would assent to anything you said, yes or no. On the 26th, the day the will was executed, the doctor found him semi-comatose, at seven A. M.; not able to recognize; he was with him two or three hours; called again in the afternoon, found him better; he was able to answer questions in regard to his pain and medicines, and how he felt. He was not able to carry out any conversation whatever that afternoon; he could answer yes or no, and "very well," "comforta-ble," "better," such as that; but couldn't carry out any conversation. From that day his condition did not

change. On the 30th he was very low indeed; rallied on the 31st, and died on the 1st November. The doctor calls his mental condition, dementia, feebleness of the faculties produced by disease; he states that acute phthisis, in the latter stages, assumes the symptoms of typhoid fever, namely, delirium and coma, and that the disease of Mr. Langton assumed that character in the first portion of October.

Dr Charles Phelps, called as an expert, had Dr. Powell's testimony read to him, and testified that Mr. Langton's mental condition was such as to incapacitate him from transacting business.

The remaining witnesses, who testify to the unsoundness of Mr. Langton's mind, are non-professional, and are fifteen in number. John P. Burhans, Charles C. J. Beck, Isabella Hunter, Matilda Hunter, Sarah Robbins, James J. Morrison, Edward C. Johnson, William Marsh, James Shindler, Jonathan V. Cockcroft, David Tilton, John G. Armour, Philip L. Myers, Ebenezer H. Balch, George C. Hathorn. Those who testify to the soundness of his mind are seven. Patrick McElroy, Frank C. Oakley, J. Romaine Brown, Randolph Brant, Edward Snyder, and Herman Davyzer.

I think it is not too much to say that the weight of the testimony shows that Mr. Langton's mind was unsettled and unsound for some time previous to his death. Mr. Burhans found it so, a week before his death. Mr. Beck noticed his mind wandered the latter part of the month before his death. Isabella Hunter saw him unconscious on the 20th October, and found his mind wandering on the 24th; Matilda Hunter says he could not converse on the 22d, or on the 29th October. Sarah Robbins, Mrs. Langton's sister, says he did not recognize her on the 27th, and does not think him competent to transact business from that day till his death; that his mind was unsound. Mr. Morrison thought him weak-minded a month before his death. Mr. Johnson thought his mind unsound for

two months before his death. Mr. Marsh thought him crazy three weeks or a month before his death; so did Mr. Shindler. Mr. Cockcroft discovered a weakness of the mind three or four months before his death; he and Mr. Tilton related a scene in a street car, indicating insanity in Mr. Langton, about three weeks before his death. Mr. Armour found a change in his mind about the 1st of October. Mr. Meyer saw a change in his mind about four weeks before his death. Mr. Balch says he could not transact business two weeks before his death. Mr. Hathorn thought him "flighty" in August.

On the other hand, Mr. McElroy saw him two or three months before his death, and saw nothing indicating he was not a man of sound mind. Mr. Oakley (testifying December 9, 1867), says that Mr. Langton died about four years before that date, and says that he saw him quite frequently probably the last six months of his life, and never saw anything in him that indicated unsoundness of mind. Mr. Brown had a last conversation with him two or three months before he died, and don't recollect it particularly; never saw any insanity in him. Mr. Brant did not see him later than a couple of months before his death, and judges his mind was sound enough. Mr. Snyder paid Mr. Langton rent a month or six weeks before his death, and says he was sane enough to collect his rent and to converse. Mr. Danzyer thinks he was of sound mind on the 1st of October.

There remains but one other branch of the case to be considered. It is attempted to be shown, in order to sustain the allegations of undue influence, that Mr. Langton, when in sound health and sound mind, had evinced a dislike to the church, which is the chief legatee and devisee under this will, and had expressed an affection for his wife, for whom the will provides so inadequately.

Mr. Shindler swears that, four or five months prior to Mr. Langton's death, he told him, Shindler, what property he had he intended to leave to his wife and adopted

child; and went on to speak of the church and the clergymen, saying to the witness: "You have known me for a great many years; I never was a church man; never professed any religion; and the ministers and priests and nobody came near me until they thought I was going to die, and now they are running after me;" and he made a remark reflecting very much upon them; he said: "If they ever get a d—d cent out of me, I will be surprised; for what I have got I shall leave to my wife and adopted child;" he denounced the church and all churches.

Mr. Cockcroft says that, two years before his death, Mr. Langton stated that he intended that his wife should have all his property, and some heir or child or other.

Mr. Armour heard Mr. Langton, a year before his death, say he was pleased that the Fenians were taking away the money from the priests, and that the priests were losing the money; spoke against the Catholic church and clergy, and said they robbed the poor; said he had not been to church but once in fifteen years; said he meant to leave his wife all his property, and thanked God he had enough to leave her comfortable.

Other testimony is given of similar remarks made during the last month of his life, which I do not take into consideration.

Unless I utterly discredit these sworn statements, I must believe that Mr. Langton, while in an enfeebled state of intellect, and when, as his physician shows, he was not possessed of a disposing mind, suddenly changed the opinions and prejudices of a lifetime, and altered his purpose as to the disposition of his property; and, in view of approaching death, endeavored to make his peace with the religion he had scoffed at and offended; and this by depriving his wife of the provision he had always thitherto intended to make for her. The will was drawn without her knowledge, and under circumstances which, while they attribute no culpability to respectable counsel, and clergymen, who assisted in it, deprive the transaction

of the character of openness and publicity. The counsel and the clergyman may not have been, and probably were not aware of the influence they were exercising, but I cannot doubt that that influence was so great and pervading as to make this instrument the will, not of Patrick M. Langton, but of Mr. Glover and Dr. McGlynn.

I must, therefore, refuse probate, and reject the instrument.